**IN THE UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **MARVIN SHOFFNER,** | : | **CIVIL ACTION NO. 1:26-CV-1820** |
| | : | |
| **Plaintiff** | : | **(Judge Neary)** |
| | : | |
| **v.** | : | |
| | : | |
| **PENNSYLVANIA DEPARTMENT OF CORRECTIONS, *et al.*,** | : | |
| | : | |
| **Defendants** | : | |

**MEMORANDUM**

This is a prisoner civil rights case filed pursuant to 42 U.S.C. § 1983. Plaintiff, Marvin Shoffner, alleges that defendants violated his civil rights in seven separate incidents over a period of nearly a year in two different prisons. After reviewing the complaint pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A, Shoffner's claim that defendants were deliberately indifferent to a serious risk of harm in their response to his hunger strike will be dismissed with prejudice for failure to state a claim upon which relief may be granted, all other claims will be dismissed without prejudice as misjoined to that claim in violation of Federal Rule of Civil Procedure 20, and this case will be closed.

## I. Factual Background & Procedural History

Shoffner filed this case on June 16, 2026, and the court received and docketed his complaint on June 30, 2026. (Doc. 1). According to the complaint, Shoffner was struggling with his mental health when he was incarcerated in Frackville State Correctional Institution ("SCI-Frackville") on August 27, 2025, when a nurse,

"Nurse Bill," came to his cell and asked him if he was on a hunger strike. (Id. ¶ 30). Shoffner told Bill that "God spoke to him and said 'don't concern yourself with eating[,] fast for forty days and forty nights and I will nourish you with the holy spirit." (Id.) Bill purportedly responded, "you full of shit [sic] I don't believe you, I will take $25 of your account every day then we will see how long you want to be on a hunger strike." (Id. ¶ 31).

On August 31, 2025, defendant Herb, the prison's correctional health care administrator, and an unnamed medical provider placed Shoffner in a "camera cell" for observation pursuant to the prison's policy for responding to hunger strikes. (Id. ¶ 32). Shoffner began to accept water that was offered by the medical department. (Id.) He also accepted the meals offered to him, "so his account [would] stop being deducted $5.00" but did not eat the meals. (Id.) Shoffer was purportedly encouraged by defendants Dan, Damiter, and Reese to "hide his starvation by accepting the meals and just throw them in the toilet." (Id. ¶ 33).

On or around September 2, 2025, defendant "Kyle," a medical provider, released Shoffner from the prison's hunger strike protocol, despite the fact that Kyle and others had not seen him consume any food. (Id. ¶ 34). Prison staff were allegedly aware of the fact that Shoffner had not eaten any food in the previous few days because he had been on camera the entire time he was in the camera cell. (Id.) Shoffner purportedly missed 13 meals during his time in the cell. (Id. ¶ 35).

Upon his release from the camera cell, he was sent to a single cell in the restricted housing unit ("RHU"). (Id. ¶ 37). He was purportedly feeling dizzy and

lightheaded at this point. (Id.) Correctional officer Viars delivered a meal to his cell. (Id.) Shoffner accepted the meal, but placed it on the floor of his cell without eating it. (Id.) Viars asked Shoffner, "not eating still huh," and Shoffner responded, "no." (Id.) Shoffner continued to refuse to eat his food for the following three nights, but neither Viars nor correctional officer Wolf reported the fact that he was refusing to eat meals to his superiors. (Id. ¶ 38). Shoffner was purportedly showing signs of dehydration, such as dry, cracked lips, lightheadedness, and "dark copper like urine." (Id. ¶ 40).

On September 4, 2025, Shoffner reported to Nurse Crest that he woke up on the floor of his cell with a head injury and did not remember what had happened. (Id. ¶ 41). Crest stated that it was probably because he was not eating and told him to attend a sick call. (Id.) Shoffner then told a sergeant about his injury and that he was having chest pains and the sergeant took him to the prison's infirmary. (Id.)

Upon his arrival at the infirmary, "Nurse Megan" said to Shoffner, "your keytones [sic] show[] that your body is in the stage of dehydration and is in desperate need of liquids, would you allow me to give you IV fluids"? (Id. ¶ 42). Shoffner stated that he would "have to ask God first." (Id.) After this conversation, Dr. Glushakow approached Shoffner's cell and asked him, "what are you trying to get[?] [E]verything you do is for a reason. [W]hat you trying to get your D-Code again[?] It's not going to happen I made sure of it." (Id. ¶ 44). Shoffner was subsequently taken to an outside hospital where he was treated for dehydration and

a head injury. (Id. ¶ 45). While in the hospital, he continued to accept trays but then threw the food in the toilet. (Id.)

Upon his return to SCI-Frackville, several staff members asked him if he was continuing to refuse to eat or drink. (Id. ¶ 46). Shoffner responded, "Yes until God tells me otherwise y'all are trying to force me to disobey my God I won't do it." (Id.) registered nurse Trutt responded, "Dr. Glushakow has told me that he has labeled you a pathological liar who always doing something for secondary gain and to believe nothing you say. God talks to me too and the God you spoke to is not the true God." (Id.)

Shoffner was placed back in the RHU, but after he refused the next nine meals, he was escorted back to the camera cell for observation under the prison's hunger strike protocol. (Id.) The complaint alleges that the relevant policy for correctional staff to respond to a hunger strike is written in a way that violates prisoners' constitutional rights because it is written "in a threatening and retaliatory fashion to be utilized as a weapon to discourage inmates from hunger striking." (Id. ¶ 50). Specifically, Shoffner argues that a provision of the policy requiring the prisoner to pay a $5 copay for each medical consultation he is given during the hunger strike violates his civil rights. (Id. ¶ 51).

On September 16, 2025, defendants Reese and Damiter asked Shoffner if he would accept meals at the same time they served inmates participating in Ramadan. (Id. ¶ 53). After "deep prayer and revelation" Shoffner told the prison's chaplain that he would agree to this and eat before sunrise and after sunset. (Id.)

After he said this, however, Reese and Damiter purportedly said that they were "no longer interested in accommodating [Shoffner] in such a way because it [would] consist of having the kitchen prepare a meal for [him] at a specific time." (Id.) Reese and Damiter allegedly told Shoffner that he would have to accept the meal at the normal time of 4:20 p.m., which forced Shoffner to wait "3 to 4 hours" until after sunset to eat the meal. (Id. ¶ 54).

On September 17, 2025, Damiter told Shoffner that he would be "seeing parole tomorrow" and that after that they could contact the "OPM"[1] to get Shoffner transferred to another prison, but that he would not do so unless Shoffner stopped his hunger strike. (Id. ¶ 56). Shoffner told him that he was not on a hunger strike, but rather a "spiritual fast." (Id.) Damiter told Shoffner he would have his meal put in the fridge so that Shoffner could eat it after sunset, and told him to tell the correctional officers and nurses who asked that he was eating and drinking as normal so that he could be taken off hunger strike protocol and transferred out of the prison. (Id.) Shoffner asserts that this agreement "placed significant pressure" on him "which directly coerced [him] to conform his behavior," but that he "did so to get transferred." (Id. ¶ 57). The complaint also asserts that during an unspecified period around this time, Shoffner was denied "multiple spiritual adviser visits," showers, clean clothing, toothpaste, a toothbrush, and soap. (Id. ¶ 58). Shoffner was

[1] The court assumes this a reference to the Department of Corrections' Office of Personnel Management.

purportedly denied showers for four weeks, but the complaint does not state how long the other deprivations lasted. (Id.)

Approximately one month after Shoffner's hunger strike ended, on October 23, 2025, he allegedly "swallowed a pen, toothbrush, and four tubes of toothpaste" in front of correctional officer Reed and stated that he was "extremely suicidal." (Id. ¶ 59). Reed allegedly stated, "good for you monkey," and left. (Id.) Shoffner told a John Doe correctional officer that he was suicidal, and the John Doe officer stated that he would report it to another John Doe officer. (Id.) After Shoffner received "no further response," he became "overwhelmed with depression and intense suicidal ideations." (Id. ¶ 60). Shoffner allegedly covered the door to his cell and became "completely unresponsive as he started to carry out his suicide plan." (Id.)

One of the John Doe officers walked by Shoffner's cell around 11:30 p.m., 12:33 a.m., and 1:00 a.m., but ignored the fact that Shoffner's cell door was covered. (Id. ¶ 61). The officer allegedly knocked on Shoffner's door, received no response, and left. (Id.) Sometime between 2:00 a.m. and 2:37 a.m., the John Doe correctional officer returned, opened the security glass to the cell, said, "aye, dickhead you alive," received no response, and left. (Id. ¶ 62).

Sometime between 2:55 a.m. and 3:01 a.m., lieutenant Klimas and correctional officer Pliska came to Shoffner's cell and began banging on the cell door asking Shoffner to uncover the cell. (Id. ¶ 63). Shoffner uncovered the cell door and told Klimas that he swallowed foreign objects, that he could die from it, but that he had been refused medical attention. (Id.) Shoffner told Klimas that he was afraid he

might die from the items he had swallowed. (Id. ¶ 64). On November 7, 2025, Shoffner was allegedly denied follow-up care such as an x-ray. (Id. ¶ 65). A John Doe correctional officer purportedly falsified documents indicating that Shoffner had refused treatment. (Id. ¶ 65).

On December 1, 2025, Shoffner was purportedly denied a visit with his "spiritual adviser." (Id. ¶ 66). He reported this to Sergeant Schoch, who purportedly left and spoke with the correctional officer who had denied the visit. (Id. ¶¶ 66-67). Schoch then told Shoffner, "the visiting room officer CO Whitko said Jehovah Witnesses is not a real religion so you have to choose which one you want to go to and if you have a problem write a grievance." (Id. ¶ 67).

On December 4, 2025, Shoffner purportedly told a John Doe sergeant that he was having "extreme suicidal ideations and was strongly thinking about swallowing foreign objects in hopes to puncture [his] intestine and die." (Id. ¶ 68). The sergeant purportedly left the area without responding. (Id. ¶ 69). Shoffner then reported his suicidal ideations to defendant Davis, who purportedly responded, "Lt. Klimas, already told [me] not to pay your RAT ass no mind, let you swallow whatever you want." (Id. ¶¶ 69-70). Davis came by the cell on three separate occasions that evening, and Shoffner asked for help, but Davis purportedly ignored him. (Id. ¶ 70).

At approximately 12:00 a.m., Shoffner purportedly swallowed unspecified "foreign objects" in front of correctional officer Wise and told him that he was going to hang himself. (Id. ¶ 71). Wise left the area, returned around 12:34 a.m., and stated "Lt. Klimas said, that's on you if you die you die." (Id.)

On December 28, 2025, at approximately 8:45 p.m., Shoffner told correctional officer Klock that he needed to speak with a lieutenant or a sergeant because he was having thoughts of self-harm and swallowing foreign objects. (Id.) Shoffner repeated this request several times as the officer made rounds, but the officer allegedly ignored it. (Id.) Shoffner then told the officer at 9:45 p.m. that he had swallowed a "metal spring" and was "thinking about swallowing a G.2 pilot pen." (Id. ¶ 73). The officer allegedly laughed and continued his rounds. (Id.) Shoffner purportedly told correctional officer Pliska that he was having thoughts of self-harm at approximately 10:08 p.m., but Pliska allegedly responded, "your rat ass keep doing this, we going to let you just die." (Id.) Shoffner then told correctional officer Bera that he swallowed a metal spring but that Klock had refused to give him medical care, and Bera allegedly responded, "that's between y'all I'm not getting involved." (Id. ¶ 74). Sergeant Wolford and correctional officer Skinner then asked Shoffner if he was being serious and he said that he was. (Id.)

Shoffner was sent to an outside hospital on December 29, 2025, for treatment arising from the swallowing of the metal spring, which necessitated a "very dangerous surgery that left him in pain." (Id. ¶ 75). Upon his return to SCI-Frackville, Shoffner told nurse Michelle that he was experiencing stomach pain and nausea. (Id.) However, he was released back to his cell in the RHU without any further treatment. (Id. ¶ 76). Shoffner told "nurse Dan" that he was vomiting and having stomach pain and throat pain, but Dan allegedly told him "stop being a

dumb ass then you won't have these issues." (Id. ¶ 77). Dan said they were not going to give him pain medications and that he should "let this be a lesson." (Id.)

Shoffner subsequently spoke to Dr. Nawabi, who told him that the metal spring had "shifted" from the right side of his body to his left side, which was likely causing the pain in his stomach. (Id. ¶ 78). Nawabi told him that the throat pain was likely a result of the surgery and that he was not going to prescribe any pain medication because it would likely resolve itself soon. (Id.)

On January 11, 2026, Shoffner told correctional officer Teeter that he was having suicidal thoughts. (Id. ¶ 79). Teeter purportedly responded, "too bad I didn't hear you." (Id.) Teeter walked away, and Shoffner subsequently swallowed "several objects," which caused severe pain in his throat and stomach. (Id.) Shoffner did not receive medical care until the following day, at which point defendant Damiter told him that he if he did not "tell medical that he did not really ingest foreign objects he [would] be taken off the transfer bus that was scheduled that week." (Id.)

Shoffner was transferred to SCI-Coal-Township on an unspecified date. On February 26, 2026, while in SCI-Coal Township, he swallowed a pen in front of two correctional officers after informing a lieutenant that he was suicidal. (Id. ¶ 80). Shoffner's medical care was purportedly "delayed," but he then remained in the prison infirmary for "almost a month" where he was "subjected to multiple x-rays and medications." (Id. ¶ 81).

In addition to Shoffner's suicidal behavior, the complaint alleges that he was subjected to a pattern of retaliatory conduct. According to the complaint, on

September 29, 2025, after he had returned from one of his hospital visits, defendant Klimas purportedly told Shoffner that he was "acquainted with correctional officers at SCI-Phoenix" that Shoffner had sued in a separate lawsuit. (Id. ¶ 82). Klimas and other officers asked Shoffner to drop his lawsuit against the SCI-Phoenix officers, but he refused, allegedly causing them to call him a "foolish, dumb n[****]," and administer an electric shock through a "shock belt." (Id. ¶ 83). Klimas, and correctional officers Snyder and Curlis then allegedly called Shoffner "all kinds of derogatory names and showed him videos of black men getting tortured, homosexual black men, and even took pictures of [Shoffner] claiming to photoshop it to look like [he] was cooperating" with prison officials. (Id. ¶ 84). Klimas purportedly stated, "we are going to have a good time with you tonight and you can try to rat us out all you want, no one is going to believe you. After speaking with Dr. Glushakow I'm sure you are going to be just another pathological liar trying to get over the system." (Id. ¶ 85). On September 30, 2025, Klimas allegedly shocked Shoffner eight times with the "rack belt," and then purportedly falsified documents to indicate that the use of force was justified. (Id. ¶ 86).

On October 24, 2025, Klimas came to Shoffner's cell, purportedly to see if Shoffner was "okay" after an unspecified interaction between Shoffner and Pliska. (Id. ¶ 87). Klimas then told Shoffner to come closer to the cell door, opened the wicket of the cell, and allegedly grabbed Shoffner's "private parts squeezing and then yanking them," which caused Shoffner to "scream out in pain." (Id. ¶ 88).

Klimas purportedly stated, "you keep causing a problem we coming in there." (Id. ¶ 89).

The complaint alleges that in addition to these actions, Shoffner was "approached by" defendants Damiter, Kraynak, Bill, and others and "coerced" to withdraw grievances against prison officials. (Id. ¶ 90). On December 29, 2025, at approximately 6:20 a.m., defendant Skinner allegedly told Shoffner, "since you want to play games watch this, I got something for you." (Id. ¶ 91). Skinner then purportedly walked away after Shoffner told him that he had swallowed a pen. (Id.) After Shoffner returned from the hospital following the incident, several items were missing from his cell, including pictures and two manila envelopes full of witness statements that were "non-replaceable and crucial to winning [Shoffner's] PCRA [case]." (Id.)

On January 22, 2026, while Shoffner was in SCI-Coal Township, Shoffner told correctional officer Mirarchi that he needed "serious help and understanding" because he was dealing with paranoia and anxiety. (Id. ¶ 92). Shoffner requested to be transferred to general population. (Id.) Mirarchi responded that he did not think Shoffner was "qualified" but that the ultimate decision would be up to the "P.R.T." (Id.) Mirarchi then said that from reading Shoffner's file he believed Shoffner had an "entitlement issue that he is here to break." (Id.)

On February 16, 2026, Shoffner purportedly suffered a "mental break down" and had thoughts of suicide. (Id. ¶ 93). After being "talked down from killing himself" by unnamed individuals, he requested to be taken to a psychiatric

observation cell. (Id.) Sergeant Wolfgang purportedly responded, "No, I know who you are and you have the right one today," he then allegedly pepper-sprayed Shoffner. (Id.) Shoffner was then purportedly refused 17 meals between February 17, 2026, and February 24, 2026 by a John Doe correctional officer, which resulted in his hospitalization. (Id. ¶ 94).

The complaint alleges that several prison employees at SCI-Coal Township, including defendants Brown, Sowerbey, Cochunis, Anderson, Neva, Adams, and Kaufman, have verbally harassed Shoffner by calling him a rat, calling him crazy, telling him to kill himself, and threatening violence against him. (Id. ¶¶ 95-96). On April 17, 2026, Shoffner purportedly told Neva that he was having suicidal thoughts, but Neva allegedly responded, "do us all a favor and just kill yourself already you the one who assaulted my co-workers I could care less." (Id. ¶ 97). Shoffner then purportedly experienced "symptoms" from an unspecified cause, which caused him to urinate and defecate on himself. (Id.) Neva purportedly left Shoffner in the prison yard throughout the symptoms and did not allow him to take a shower or get clean clothing afterwards. (Id.) Defendants Daubert, Holloway, Bartlow, and Russo, have also purportedly denied Shoffner clean clothing, towels, and linens on several occasions and have made "comments such as 'fuck your rapist ass you wasn't worr[ied] about towels when you [were] touching those little kids.'" (Id. ¶ 98).

On May 8, 2026, following numerous requests to speak privately with "P.S.S. Mack," Shoffner was forced to speak with her at the door of his cell. (Id. ¶ 100).

Mack purportedly told Shoffner that he needed "to stop being a pussy and accept his consequence for placing his hands on her co-workers, and that no one will believe his lying ass we made sure of that so suck it up." (Id. ¶ 101).

The complaint additionally alleges purported violations of Shoffner's rights to due process and access to the courts during prison disciplinary proceedings. Specifically, Shoffner alleges that he was charged with assaulting staff and disobeying a direct order on October 6, 2025, but was not given supporting paperwork for the charges. (Id. ¶ 102). Shoffner could purportedly tell based on discrepancies in the dates that the document had been falsified. (Id. ¶ 103). Shoffner was taken to a resulting disciplinary hearing on October 7, 2025. (Id. ¶ 105). He requested to call three witnesses on his behalf, but defendant Jordan refused to do so. (Id. ¶ 106). Jordan purportedly refused to hear Shoffner's version of events, stated that she believed the version of events provided by lieutenant Klimas, and sanctioned Shoffner to 90 days of disciplinary custody. (Id.) Shoffner requested a different fact-finder to preside over the hearing out of a belief that Jordan was biased against him, but she refused the request. (Id. ¶ 107).

On September 5, 2025, Shoffner's inmate account "started to be deducted" without his permission. (Id. ¶ 110). Shoffner was also purportedly denied phone calls on November 16, 2025, which were necessary to litigate his civil cases. (Id. ¶ 111). One of the correctional officers who denied the calls purportedly told him, "we not going to make it easy for you to sue one of ours." (Id.) Shoffner was also

purportedly denied grievances, cash slips, and other items necessary to litigate his cases on December 28, 2025. (Id. ¶ 112).

On April 30, 2026, while Shoffner was incarcerated in SCI-Coal Township, the complaint alleges that correctional officer Mirarchi informed that he had been charged with aggravated assault and that a preliminary hearing was scheduled for May 13, 2026. (Id. ¶ 113). Mirarchi allegedly told him, "I will make sure you never receive a legal call since I found out that you [are] suing one of my fellow SCI facilities and you think you can put your hands on my officers." (Id.)

Shoffner advances claims for violations of his First, Fifth, Eighth and Fourteenth Amendment rights, his rights under the Religious Freedom Restoration Act ("RFRA") and Religious Land Use and Institutionalized Persons Act ("RLUIPA"), his rights under the Americans with Disabilities Act ("ADA"), and several state tort claims against 71 defendants. (Id. at 19). He requests damages and various forms of declaratory and injunctive relief. (Id. at 21-23).

## II. Legal Standard

The Prison Litigation Reform Act authorizes a district court to review a complaint in a civil action in which a prisoner is proceeding *in forma pauperis* or seeks redress against a governmental employee or entity. See 28 U.S.C. §

1915(e)(2);[2] 28 U.S.C. § 1915A.[3] The court is required to identify cognizable claims and to *sua sponte* dismiss any claim that is frivolous, malicious, fails to state a claim upon which relief may be granted, or seeks monetary relief from a defendant who is immune from such relief. See 28 U.S.C. § 1915(e)(2)(B); 28 U.S.C. § 1915A(b).

In screening claims under Sections 1915A(b) and 1915(e)(2)(B), the court applies the standard governing motions to dismiss filed pursuant to Rule 12(b)(6) of the Federal Rules of Civil Procedure. See, e.g., Coward v. City of Philadelphia, 546 F. Supp. 3d 331, 333 (E.D. Pa. 2021); Smith v. Delaware, 236 F. Supp.3d 882, 886

---

[2] 28 U.S.C. § 1915(e)(2) provides:

**(2)** Notwithstanding any filing fee, or any portion thereof, that may have been paid, the court shall dismiss the case at any time if the court determines that—
  **(A)** the allegation of poverty is untrue; or
  **(B)** the action or appeal—
    **(i)** is frivolous or malicious;
    **(ii)** fails to state a claim on which relief may be granted; or
    **(iii)** seeks monetary relief against a defendant who is immune from such relief.

[3] 28 U.S.C. § 1915A provides:

**(a) Screening.**--The court shall review, before docketing, if feasible or, in any event, as soon as practicable after docketing, a complaint in a civil action in which a prisoner seeks redress from a governmental entity or officer or employee of a governmental entity.
**(b) Grounds for dismissal.**--On review, the court shall identify cognizable claims or dismiss the complaint, or any portion of the complaint, if the complaint--
  **(1)** is frivolous, malicious, or fails to state a claim upon which relief may be granted; or
  **(2)** seeks monetary relief from a defendant who is immune from such relief.

(D. Del. 2017). This standard requires the court to "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under any reasonable reading of the complaint, the plaintiff may be entitled to relief." Phillips v. County of Allegheny, 515 F.3d 224, 233 (3d Cir. 2008) (quoting Pinker v. Roche Holdings, Ltd., 292 F.3d 361, 374 n.7 (3d Cir. 2002)).

Federal notice and pleading rules require the complaint to provide "the defendant fair notice of what the . . . claim is and the grounds upon which it rests." Phillips, 515 F.3d at 232 (alteration in original) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007)). To test the sufficiency of the complaint, the court conducts a three-step inquiry. Santiago v. Warminster Township, 629 F.3d 121, 130-31 (3d Cir. 2010). In the first step, "the court must 'tak[e] note of the elements a plaintiff must plead to state a claim.'" Id. at 130 (alteration in original) (quoting Ashcroft v. Iqbal, 556 U.S. 662, 675 (2009)). Next, the factual and legal elements of a claim must be separated; well-pleaded facts are accepted as true, while mere legal conclusions may be disregarded. Id. at 131-32. Once the court isolates the well-pleaded factual allegations, it must determine whether they are sufficient to show a "plausible claim for relief." Iqbal, 556 U.S. at 679 (citing Twombly, 550 U.S. at 556). A claim is facially plausible when the plaintiff pleads facts "that allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Id. at 678.

Courts must liberally construe complaints brought by *pro se* litigants. Sause v. Bauer, 585 U.S. 957, 960 (2018). *Pro se* complaints, "however inartfully pleaded,

must be held to less stringent standards than formal pleadings drafted by lawyers." Erickson v. Pardus, 551 U.S. 89, 94 (2007).

## III. Discussion

Shoffner's federal constitutional claims are filed pursuant to 42 U.S.C. § 1983. Section 1983 creates a cause of action to redress constitutional wrongs committed by state officials. 42 U.S.C. § 1983. The statute is not a source of substantive rights, but serves as a mechanism for vindicating rights otherwise protected by federal law. See Gonzaga Univ. v. Doe, 536 U.S. 273, 284-85 (2002); Kneipp v. Tedder, 95 F.3d 1199, 1204 (3d Cir. 1996). To state a Section 1983 claim, plaintiffs must show a deprivation of a "right secured by the Constitution and the laws of the United States . . . by a person acting under color of state law." Kneipp, 95 F.3d at 1204).

### A. Joinder

Because Shoffner's complaint contains seven separate and distinct claims that are clearly misjoined in the same lawsuit, the court will consider the joinder issue as a preliminary matter in the interest of judicial economy.

Under Federal Rule of Civil Procedure 20, claims against multiple defendants may be joined in the same action only if:

> **(A)** any right to relief is asserted against them jointly, severally, or in the alternative with respect to or arising out of the same transaction, occurrence, or series of transactions or occurrences; and
>
> **(B)** any question of law or fact common to all defendants will arise in the action.

Fed. R. Civ. P. 20(a)(2).

A district court has two options when a plaintiff has misjoined claims: (1) dismiss the misjoined claims without prejudice on "just terms" or (2) sever the claims into separate lawsuits. Fed. R. Civ. P. 21; DirecTV, Inc. v. Leto, 467 F.3d 842, 845 (3d Cir. 2006). The statute of limitations for claims that are dismissed without prejudice are not tolled because the initial complaint is treated "as if it never existed." Id. (quoting Brennan v. Kulick, 407 F.3d 603, 606 (3d Cir. 2005)). When, on the other hand, the claims are severed, "the suit simply continues against the severed defendant in another guise." Id. (citing White v. ABCO Eng'g Corp., 199 F.3d 140, 145 n.6 (3d Cir. 1999)).

District courts have discretion to choose whether to dismiss or sever misjoined claims but may only dismiss the claims if doing so would be just, "that is, if doing so 'will not prejudice any substantial right'" of the plaintiff. Id. (quoting Sabolsky v. Budzanoski, 457 F.2d 1245, 1249 (3d Cir. 1972)). "Hence, a court must analyze the consequences of a dismissal on a claimant's ability to meet the statute of limitations prior to choosing dismissal over severance." Id.

Here, Shoffner's complaint plainly asserts claims based on seven completely different fact patterns: (1) the defendants' response to his hunger strike at SCI-Frackville; (2) the defendants' response to his suicidal behavior at SCI-Frackville; (3) the defendants' response to his suicidal behavior at SCI-Coal Township; (4) the defendants' allegedly retaliatory behavior at SCI-Frackville; (5) the defendants' allegedly retaliatory behavior at SCI-Coal Township; (6) the defendants' purported violations of his rights to due process and access to the courts at SCI-Frackville; and

(7) the defendants' purported violations of his rights to due process and access to the courts at SCI-Coal Township. There is simply no factual connection between these claims other than all of them allegedly happening to Shoffner while he was in the custody of the Pennsylvania Department of Corrections, which is far too attenuated a factual connection to join them in the same lawsuit.

Having found that the claims in the lawsuit are misjoined, the court will dismiss without prejudice all claims in the case except Shoffner's claim that defendants were deliberately indifferent to a risk of harm in their response to his hunger strike. All of the other facts allegedly occurred in October 2025 or later, meaning there is clearly no concern with Shoffner's ability to comply with the two-year statute of limitations for civil rights claims because the earliest claims would need to be filed in new lawsuits no later than October 2027. Accordingly, all claims in the case except the hunger strike claim will be dismissed without prejudice as misjoined in violation of Federal Rule of Civil Procedure 20 and the court's analysis will proceed to the merits solely with respect to the hunger strike claim.

**B. Hunger Strike Claim**

Shoffner's claim regarding his hunger strike sounds in deliberate indifference under the Eighth Amendment.[4] To state a deliberate indifference claim upon which relief may be granted, a plaintiff must show that defendants were deliberately

[4] To the extent Shoffner intends to advance any other claims arising out of his hunger strike, his complaint fails to state a claim upon which relief may be granted because the court simply cannot construe the complaint as advancing any other claims arising from the hunger strike.

indifferent to a substantial risk of serious harm to the plaintiff. Farmer v. Brennan, 511 U.S. 825, 828 (1994). The plaintiff must allege both that the risk of harm was objectively serious and that the defendant was subjectively aware of that risk. Id. at 834. When responding to a prisoner's hunger strike, a defendant may be found to be deliberately indifferent if he fails to monitor the prisoner during the hunger strike, fails to consistently offer the prisoner food and water, and fails to intervene to prevent any serious harm to the prisoner as a result of the hunger strike. See, e.g., Austin v. Tennis, 381 F. App'x 128, 133 (3d Cir. 2010); Freeman v. Berge, 441 F. App'x 543, 547 (7th Cir. 2006) (Posner, J.).

Here, even assuming the truth of Shoffner's allegations—as is required at this stage of litigation—his complaint clearly shows that defendants were not deliberately indifferent to a risk of harm to him during his hunger strike. Defendants closely monitored him throughout the hunger strike, including sending him to a camera cell where he could be monitored at all times on multiple occasions, offered him food and water regularly and at every meal, and intervened to prevent any serious harm to him by placing him on an IV to rehydrate him on one occasion and sending him to an outside hospital to treat him for dehydration, among other actions. (See Doc. 1 ¶¶ 30-58). It simply cannot be concluded on these facts that defendants acted with deliberate indifference to a risk of serious harm to Shoffner. Accordingly, his Eighth Amendment claim arising from his hunger strike will be dismissed for failure to state a claim upon which relief may be granted.

Before dismissing a civil rights complaint for failure to state a claim, courts must permit a curative amendment unless the amendment would be inequitable or futile. Phillips, 515 F.3d at 245. The court will deny leave to amend as futile in this case. The facts alleged in the complaint plainly show that defendants were not deliberately indifferent to Shoffner's health or safety during his hunger strike, and there do not appear to be any additional facts that could be alleged in an amended complaint that could alter that conclusion.

**IV. Conclusion**

Shoffner is granted leave to proceed *in forma pauperis*, his Eighth Amendment deliberate indifference claim arising from his hunger strike is dismissed with prejudice for failure to state a claim upon which relief may be granted pursuant to 28 U.S.C. § 1915(e)(2) and 28 U.S.C. § 1915A, and all of his other claims are dismissed as misjoined without prejudice to refiling the claims in new lawsuits. An appropriate order shall issue.

/S/ KELI M. NEARY
Keli M. Neary
United States District Judge
Middle District of Pennsylvania

Dated: August 3, 2026